IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION

| | | |
|---|---|---|
| SHEARELL COLE, | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No. 10-cv-00070-AW |
| | * | |
| PRINCE GEORGE'S COUNTY, | * | |
| MARYLAND, *et al.* | * | |
| Defendants. | * | |
| | * | |

**MEMORANDUM OPINION**

The matter currently before the Court is Officer Bruce Brown and Officer Robert Lee's motion for summary judgment. *See* Doc. No. 23. This is not the first dispositive motion the Court has addressed during the course of this litigation. Brown, Lee, and the other Defendants collectively filed a motion to dismiss, or alternatively for summary judgment, on January 28, 2010, Doc. No. 12, which the Court addressed on August 10, Doc. No. 15. In that opinion, the Court dismissed several Defendants from the suit entirely (Kennedy Bowen and the Prince George's County Police Department), bifurcated the case against Defendant Prince George's County, Maryland, and dismissed most claims in the Amended Complaint as to Brown and Lee.

The surviving claims against Brown and Lee allege infringements of the Fourth Amendment in violation of 42 U.S.C. § 1983: count VIII (excessive force), count X (wrongful death) and count XI (survival action). Although the Court allowed Plaintiff discovery on these claims, the Court expressed "grave reservations" as to whether Plaintiff would ultimately prevail on them. Doc. No. 15 at 6. The discovery record has amply confirmed the facts that led the Court, prior to discovery, to grimly forecast the fate of Plaintiff's section 1983 claims. Thus, for

1

the reasons articulated below, the Court will grant summary judgment to Brown and Lee on all remaining counts.

I. **Factual and Procedural Background**

The following facts are drawn from the Court's prior memorandum opinion, with minor variations to reflect subsequent developments in the discovery record. On September 4, 2006, a store employee at Shoppers Food Warehouse in Prince George's County observed an individual eating a stolen donut and asked him if he was going to pay for it. The individual responded by grabbing a handgun from under his shirt, putting his hands around the employee's neck, and threatening to "blow [his] brains out." Doc. No. 12, Ex. 1 at 1.

After the individual left, the employee informed the store manager, who called the police to the scene. When the officers arrived, they spoke to witnesses, obtained a physical description of the suspect, and began searching the area. When they encountered an individual who resembled the description provided by the employee, they stopped and searched him, but found no weapon. Officer Adey, not a defendant in this case, observed another individual, later identified as Anthony Johnson, in the vicinity. As he approached Johnson, Adey saw him pull out a handgun from under his waistband. When Adey ordered him to drop the gun, Johnson refused to comply and ran into the nearby woods instead, leading Adey on a foot chase.

Adey reported the situation to the police communications dispatch, and Brown, Lee, and another officer responded, joining the pursuit of Johnson. Throughout the chase, Brown and Lee shouted at him that they are police, ordering him to stop and get on the ground. Lee and Brown ultimately caught up to Johnson after he fell. They commanded him to remain on the ground and

to put his hands in the air, but he repeatedly attempted to get up and continue running away, even after Brown struck him twice on the leg with his baton to immobilize him. Lee then saw Johnson reach under his waistband, exposing a black semi-automatic handgun, while he disregarded Brown's repeated commands to show his hands. Lee yelled out to Brown that Johnson was reaching for a gun, and Lee and Brown fired nine shots at Johnson, fatally wounding him.

## II. Standard of Review

Summary judgment is only appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986). The Court must "draw all justifiable inferences in favor of the nonmoving party, including questions of credibility and of the weight to be accorded to particular evidence." *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 520 (1991) (*citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

To defeat a motion for summary judgment, the nonmoving party must come forward with affidavits or other similar evidence to show that a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A disputed fact presents a genuine issue "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson,* 477 U.S. at 248. Although the Court should believe the evidence of the nonmoving party and draw all justifiable inferences in his or her favor, a party cannot create a genuine dispute of material fact "through mere speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985).

3

### III.     Analysis

The Court's prior memorandum opinion described the legal framework that governs Plaintiff's section 1983 claims and explained why it was unlikely that Plaintiff would ultimately be able to prevail on her claims. The Court only permitted the claims to proceed into discovery out of an "air of caution," recognizing the possibility that discovery might bring to light facts that were not then available. Doc. No. 15 at 6. As it turns out, discovery has not yielded facts sufficient to establish a case for section 1983 liability, so Defendants are entitled to summary judgment. To avoid reinventing the wheel, the Court's analysis here will begin by quoting from what it said in its previous opinion (with minor modifications), and then it will address the contentions raised in Plaintiff's opposition memorandum.

Plaintiff alleges that Defendants Brown and Lee applied excessive force against Johnson in violation of the Fourth Amendment. *See Graham v. Connor*, 490 U.S. 386, 394-95 (1989). Along with her excessive-force claim, Plaintiff also argues that Defendants' fatal shooting of Johnson creates liability for wrongful death and a survival action pursuant to section 1983. In response, Defendants argue that their conduct does not constitute excessive force under *Graham*; alternatively, Defendants argue that even if their actions were excessive, they were not so clearly unreasonable as to overcome Defendants' qualified-immunity defense.

It is well-established that courts must evaluate the objective reasonableness of a particular use of force "from the perspective of a reasonable officer on the scene," with an eye toward the proportionality of the force in light of all the facts and circumstances. *Rowland v. Perry*, 41 F.3d 167, 173 (4th Cir. 1994). *Graham* provides three factors to guide the objective-reasonableness

inquiry: (1) "the severity of the crime"; (2) "whether the suspect poses an immediate threat to the safety of the officers or others"; and (3) whether the suspect "is actively resisting arrest or attempting to evade arrest by flight." 490 U.S. at 396.

Furthermore, qualified immunity protects government officials from "liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Thus, in order to defeat Defendants' qualified-immunity defense, Plaintiff must not only show that Defendants violated Johnson's constitutional rights, *Saucier v. Katz*, 533 U.S. 194, 201 (2001), but also that the rights violated were clearly established at the time of the incident, based on whether a reasonable officer would have believed the conduct to be lawful under similar circumstances, *see Wilson v. Lane*, 526 U.S. 603, 615 (1999). However, granting "summary judgment on qualified immunity grounds is improper as long as there remains any material factual dispute regarding the actual conduct of the defendants." *Rainey v. Conerly*, 973 F.2d 321, 324 (4th Cir. 1992).

Based on the statements Brown and Lee gave during the police department's internal investigation (which were before the Court when it issued its previous opinion) and their deposition testimony, the Court is left with no doubt that their conduct was objectively reasonable given the circumstances. They were involved in an extended chase of a suspect who was known to have threatened a store employee with a gun and to have subsequently brandished the same gun in the sight of a fellow officer. He refused to obey their commands to get on the ground and put his hands in the air. When they finally caught up to him, Brown first attempted to utilize non-fatal force to subdue him by striking his leg with a baton. Only after Johnson continued resisting and reached for a gun in his waistband did Lee and Brown fire on him. The

5

tragedy of Johnson's death does nothing to change the fact that Lee and Brown's own lives were in jeopardy, and they acted well within the bounds of reasonable police practice given the perilous situation they were confronted with.

The sad reality in cases such as this is that we can never hear the Plaintiff's side of the story, because Johnson did not live to tell his tale. Thus, there can be no eyewitness testimony to counter that of the officers. In order to submit the case to a jury on something more than speculation, Plaintiff attempts to expose inconsistencies and weaknesses within the officers' own testimony, so as to show that their account of the relevant events cannot be relied upon. For the following reasons, the Court is not convinced by these attempts.

First, Plaintiff argues that Lee and Brown's testimony conflicts with the autopsy report. The autopsy revealed that several of the bullets entered through the front of Johnson's body and exited toward his back side, while others followed a pathway from back to front. Plaintiff suggests that the shots Brown and Lee fired at Johnson's back are inconsistent with their claim of self-defense. This analysis is misguided: it relies upon an unstated premise that police officers, in order to legitimately claim self defense, must refrain from firing on an armed suspect with a weapon in his hand until the suspect is turned in their direction and fully prepared to fire upon them. This premise is completely implausible. The deposition testimony shows that Brown and Lee did not fire on Johnson until after Johnson pulled his gun out of his waistband. The Court cannot ask police officers to wait any longer than this without seriously undermining their ability to protect their lives against armed criminals.

Second, Plaintiff identifies several supposed inconsistencies between Lee and Brown's testimony. For instance, just before the suspect drew his gun, Lee describes him as coming up to

his knees, whereas Brown (according to Plaintiff) "claimed that the suspect did not arise to his knees, but stayed on the ground." Doc. No. 24 at 3. This comment accurately summarizes Lee's testimony, but not Brown's. Brown does not say that Johnson remained completely on the ground. Rather, Brown testifies that Johnson "used his right elbow for support" and "turned to his right side[,] exposing his whole front towards me." Doc. No. 23, Ex. 2 at 23: 2-4. Lee and Brown emphasize different aspects of Johnson's positioning, but the Court sees no contradictions whatsoever between their respective accounts. It is easy to envision Johnson rising to his knees (Lee's testimony) while using his right elbow for support as he turns his body toward the officers (Brown's testimony).

Next, Plaintiff makes much of several minor discrepancies within and between Brown and Lee's deposition testimony regarding their positioning relative to Johnson during the final stages of the chase. The Court has reviewed the full depositions and is satisfied that all of the purported discrepancies have obvious and innocuous explanations. It can sometimes be difficult to convey relative positioning without the aid of a diagram, particularly when people are moving in relation to each other. To use a simplified example to illustrate the problem, if Person A and Person B are looking at each other, and Person B shuffles to his/her left, his/her movement can be accurately described in either of two ways: (1) "Person B moved to the *left* from *Person B's* frame of reference," or (2) "Person B moved to the *right* from *Person A's* frame of reference." The alleged contradictions in Defendants' testimony reflect legitimate confusions about the appropriate frame of reference and other innocuous considerations. In fact, most of these mix-ups were expressly cleared up when deposition counsel followed up with more precise

questions.[1] Thus, the Defendants' testimony about their respective positions yields no evidence of fabrication.

Finally, Plaintiff contends that Lee's story has changed in at least one important respect between his testimony during the police investigation and his deposition. During the investigation, Lee, when asked who fired first, replied that he thought that it was "probably" the suspect. Doc. No. 12, Ex. 3; *see also id.* ("I want to say the suspect shot, but I'm not 100% sure."); *id.* ("When I turned I believe I saw the muzzle flash, from his weapon and that's, it happened so fast that, that's when, I saw him turn, I saw his muzzle flash, and then that's when Officer Brown and myself started firing. [*sic*]"). During his subsequent deposition, Lee neither affirmed nor denied that the suspect fired his weapon; he simply answered that he does not remember. *See* Doc. No. 23, Ex. 1, at 25: 9-13 ("Q: Do you know whether or not the suspect ever fired his weapon? . . . A: "No, I do not.").

This portion of Lee's testimony comes closest to providing Plaintiff with something concrete to submit to a jury. However, given the absence of any other credible reason to doubt the veracity of the officers, the Court concludes that there is simply not enough evidence for a "reasonable jury [to] return a verdict for [Plaintiff]." *Anderson,* 477 U.S. at 248. The Court's confidence in this conclusion is bolstered by the fact that Lee's testimony is not necessarily

---

[1] Here is one representative example from Lee's deposition:

> Q: If you were behind the back of the individual suspect ten feet away, in your field of vision where was Officer Brown, to the right or to the left of the suspect?
>
> A: He would be standing – I guess *if she was the individual*, just *to the right of her*.
>
> Q: To your right in your field of vision?
>
> A: *In my field of vision* it would have been *to the left*."

Doc. No. 23, Ex. 1 at 24: 4-12.

contradictory. On both occasions, Lee expressed uncertainty. During the police investigation, he acknowledged that he was "not 100% sure" that the suspect fired a shot. Doc. No. 12, Ex. 3. By comparison, at his deposition, Lee did not flatly deny that Johnson shot at them: rather, he professed that he did not "know" one way or the other. Doc. No. 23, Ex. 1, at 25: 9-13.

Insofar as Lee's deposition reflects less certainty than his earlier responses to similar questions during the police investigation, the discrepancy is unsurprising and potentially innocuous given the well-known vagaries of human memory and communication. *See generally* Michael R. Leippe, *The Case for Expert Testimony About Eyewitness Memory*, 1 Psychol. Pub. Pol'y & L. 909, 914 t.1 (1995). Lee's statement that he may have seen a muzzle flash (and his subsequent step toward a position of greater doubt) leads one to raise an eyebrow, but with nothing else to go on, Plaintiff's overall case remains essentially speculative, and the Court cannot rightfully submit it to a jury. Accordingly, summary judgment will be granted to Defendants on all remaining claims.

### IV. Conclusion

For the reasons stated above, Defendants' motion for summary judgment, Doc. No. 23, will be granted. A separate order will follow.

  July 26, 2011                                             /s/
     Date                                       Alexander Williams, Jr.
                                                United States District Judge